In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2141

R.R.D.,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals

ARGUED MARCH 5, 2014 — DECIDED MARCH 19, 2014

Before EASTERBROOK, MANION, and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. While R.R.D. was an investigator for Mexico's Federal Agency of Investigation, he arrested hundreds of suspects and repeatedly testified against drug traffickers. Drug organizations offered bribes to get him out of their hair and, when he refused, tried to kill him under their "plata o plomo" policy—"silver or lead," colloquially "money or bullets." The Agency repeatedly trans-

ferred him to places where it thought that he would be safer, but testimony exposed him to public view and threats soon resumed. He was wounded twice while on duty and eluded capture several times. Once assassins shot at him, missed, and wounded his father. His superiors recommended that he quit for his own safety. He opened an office-supply business and tried to conceal his former job, but when strangers continued looking for him he sought asylum in the United States. He contended that he had been persecuted as a member of the social group of honest police officers. An immigration judge concluded that R.R.D. had been threatened repeatedly and remained at risk but concluded that the drug traffickers had targeted him because he hampered their organizations, not because he was in the social group of honest cops. The IJ denied the application for asylum, and the Board of Immigration Appeals agreed. A motions panel allowed R.R.D. to proceed in court under these initials to avoid what may be an ongoing risk to his safety.

Both the IJ and the BIA distinguished between risks to all honest police and risks to *effective* honest police, such as R.R.D.; they thought that only if criminal organizations target *all* honest law-enforcement officers would R.R.D. be entitled to asylum. It is far from clear to us that drawing such a distinction is permissible under 8 U.S.C. §1101(a)(42)(A), which defines the category of persons eligible for asylum as those who seek refuge here "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion". "Effective honest police" (or "honest police good enough to impose substantial costs on criminal organizations") is a subset of all honest police, to be sure, but why is that not a "social group," if "honest police" is a social

group? Anyway, the statute makes eligible a person persecuted because of his membership in a protected category; it does not require that all members of that category suffer the same fate. The law calls for assessments of causation and risk; that R.R.D. is at *more* risk than that faced by "honest police" generally is a poor reason to disqualify him from asylum, if he otherwise is eligible.

The "otherwise" is a potentially important qualifier, because persecution means adverse action by government; criminal deeds by private persons come to be treated as persecution, on the Board's view, only when the government is unwilling or unable to protect targets from private violence. See *Matter of Eusaph*, 10 I&N Dec. 453, 454 (1964). See also *Hor v. Gonzales*, 421 F.3d 497 (7th Cir. 2005); *Bitsin v. Holder*, 719 F.3d 619, 628–31 (7th Cir. 2013). Mexico has more than 400,000 police officers; the Board did not consider whether they are willing and able to protect their current or former colleagues. (R.R.D. contends that so many officers have taken the criminals' silver that the force as a whole does not protect honest police; the Board did not address this possibility.) Nor did the Board try to decide how much risk of harm shows that a government is "unable" to protect its citizens. Given the *Chenery* doctrine (*SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)), we must proceed for the purpose of R.R.D.'s petition as if private violence equates to official persecution. Likewise we must treat "honest police" as a social group, because the Board did not question its propriety. Cf. *Cece v. Holder*, 733 F.3d 662 (7th Cir. 2013) (en banc).

The Board cited *Pavlyk v. Gonzales*, 469 F.3d 1082 (7th Cir. 2006), for the proposition that honest law-enforcement agents targeted for their official work cannot use their risks

as a basis of asylum (technically, in *Pavlyk*, withholding of removal). That is not, however, what *Pavlyk* holds. Pavlyk was a fugitive from justice; Ukraine wanted him for soliciting bribes. Nor was he a member of the social group he defined, having quit his law-enforcement job years before leaving Ukraine—and he did not claim to be at risk as a member of the group of former law-enforcement officers. 469 F.3d at 1088. We wrote in *Pavlyk* that "being a prosecutor" (Pavlyk's law-enforcement role) is not an immutable characteristic, or one that no government should be allowed to manipulate (governments can choose whom to hire as prosecutors), so Pavlyk's proposed social group was inadequate and he was left only with a contention that some criminals had a personal vendetta against him.

Like Pavlyk, R.R.D. was no longer a member of his proposed social group by the time he sought asylum. But unlike Pavlyk, R.R.D. asserts that he faces persecution as a member of the social group of honest former law-enforcement agents in Mexico. Being a former agent is an immutable characteristic; nothing R.R.D. can do will erase his employment history. See *Escobar v. Holder*, 657 F.3d 537 (7th Cir. 2011); *Sepulveda v. Gonzales*, 464 F.3d 770, 772 (7th Cir. 2006); *Matter of Fuentes*, 19 I&N Dec. 658, 662 (1988).

All the BIA had to say about this possibility is: "Nor has [R.R.D.] established a well-founded fear of persecution on account of his status as a former police officer where [he] did not experience persecution after leaving the police force, the record does not show persecution of former police officers, and eight years have now passed since [R.R.D.] left Mexico." (Internal citation omitted.) The Board did not mention R.R.D.'s testimony, which the IJ believed, that people came

looking for him in Mexico after he quit the police force. The IJ also believed R.R.D.'s testimony that drug gangs use unarmed scouts to locate targets, and that R.R.D. reasonably believed that these men were scouts for assassins. The IJ did not believe the testimony of R.R.D.'s wife that these scouts had R.R.D.'s picture, but that does not affect the nature of the risk R.R.D. faced. He and his wife testified that unknown men continued trying to find him even after he left Mexico. Threats can imply a risk of future persecution if they are sufficiently menacing and credible. *Escobar*, 657 F.3d at 544.

And the record contains evidence that drug organizations have tried to locate and kill other officers who resigned from the police and left the country. Punishing people after they are no longer threats is a rational way to achieve deterrence; indeed, the United States itself does this. A perpetrator of securities fraud who leaves the financial profession, and no longer poses a threat to investors, still faces criminal prosecution, the better to deter other fraudsters. There's nothing implausible about R.R.D.'s testimony that drug organizations in Mexico share this view of deterrence.

Yet although the record contains evidence that drug-dealing organizations in Mexico target former police officers in general, and R.R.D. in particular, the Board did not mention it. That won't do. The Board must analyze rather than ignore material evidence. *Escobar*, 657 F.3d at 544. Perhaps the Board thinks that the risk R.R.D. faces as a former officer is too slight to satisfy the standard for asylum, but it did not say this. *Chenery* requires us to return this matter to the Board.

We have said enough to show why the order of removal cannot stand without further proceedings. We also wonder

why the Department of Homeland Security *wants* to remove R.R.D. and his family. The IJ found that R.R.D. was an honest and effective police officer in Mexico, willing to bring criminals to justice at substantial risk to himself. He appears to have led an exemplary life in the United States since entering (lawfully) and applying for asylum. He appears to be someone who should be hired and put to work by the Department of Homeland Security itself, rather than sent packing. We do not supervise the exercise of prosecutorial discretion, but those who do have that power should review R.R.D.'s situation before renewing any effort to remove him.

The petition is granted, the order of removal is vacated, and the case is remanded to the Board of Immigration Appeals for proceedings consistent with this opinion.